(R.D. 11273)

LOCKWOOD & FREIDIN v. UNITED STATES

Entry No. 4668, etc.

(Decided March 14, 1967)

*Barnes, Richardson & Colburn* (*Joseph Schwartz* of counsel) for the plaintiff.
*Barefoot Sanders*, Assistant Attorney General (*Sheila N. Ziff*, trial attorney), for the defendant.

Ford, Judge: The appeals listed in schedule "A," annexed hereto and made a part hereof, have been filed by Lockwood & Freidin, customs brokers, on behalf of the actual importer, Rico, Inc. These appeals are directed against the appraisement of a number of shipments of canned frozen strawberries and crushed strawberries (puree) in 30-pound cans and in some instances 10-pound cans, which were exported by Empacadora Mexicana, S.A., from April 1958 to July 1963.

The merchandise was appraised at various values on the basis of similar merchandise under the provisions of section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, 91 Treas. Dec. 295, T.D. 54165. Plaintiff herein does not contest the basis, export value, but contends the export value of the identical strawberries as represented by the invoice price is the proper export value under section 402(b), *supra*. The invoice prices of Empacadora Mexicana, S.A., frozen strawberries ranged from 9 cents to 12 cents per pound f.o.b., Silao, Mexico, and the strawberries were appraised at values ranging from 9 cents to 16.5 cents per pound, net packed. The claims in the appeals in which the appraised value was less than the invoice value, having been abandoned, are accordingly dismissed.

The pertinent portions of the statute involved herein provide as follows:

Section 402, Tariff Act of 1930, as amended by the Customs Simplification Act of 1956:

Section 402(b):

(b) Export Value.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

Section 402(f):

(f) Definitions.—For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

(2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

(3) The term "purchasers at wholesale" means purchasers who buy in the usual wholesale quantities for industrial use or for resale otherwise than at retail; or, if there are no such purchasers, then all other purchasers for resale who buy in the usual wholesale quantities; or, if there are no purchasers in either of the foregoing categories, then all other purchasers who buy in the usual wholesale quantities.

(4) The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which export value, United States value, or constructed value, as the case may be, can be satisfactorily determined:

(A) The merchandise undergoing appraisement and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, the merchandise undergoing appraisement.

(B) Merchandise which is identical in physical characteristics with, and was produced by another person in the same country as, the merchandise undergoing appraisement.

(C) Merchandise (i) produced in the same country and by the same person as the merchandise undergoing appraisement, (ii) like the merchandise undergoing appraisement in component material or materials and in the purposes for which used, and (iii) approximately equal in commercial value to the merchandise undergoing appraisement.

(D) Merchandise which satisfies all the requirements of subdivision (C) except that it was produced by another person.

The record herein consists of the testimony of four witnesses, two called on behalf of each of the respective parties as well as a number of exhibits.

Basically, the record establishes that Rico, Inc., and Empacadora Mexicana, S.A., are related persons under the definition given in section 402(g) of said act, *supra*, and that Rico, Inc., finances the pro-

duction and packing of the strawberries by Empacadora Mexicana, S.A. It has been further established that Rico, Inc., purchases the entire output of the exporter at a price set prior to the production of the involved strawberries. By virtue of this, the record establishes that the exporter incurs no financing or warehouse charges since the strawberries are shipped immediately to the United States. The price agreed upon is an f.o.b. plant price and all transportation, duties, and other charges are paid for by the importer herein.

On the other hand, the record establishes that the other exporters of frozen strawberries from Mexico, while offering the merchandise f.o.b. plant with a 4 cents per pound allowance, always sold f.o.b. Laredo or other United States ports of entry, which price included transportation, duties, and other charges.

In addition thereto, the other producers of frozen strawberries sold their merchandise through food brokers whose commissions, insofar as the record reveals, ranged from 4 percent to 7 percent of the f.o.b. Laredo price. The record further establishes that the production of the exporter herein constitutes 25 to 35 percent of the total Mexican production of frozen strawberries exported to the United States.

The issues presented by the parties are whether the manner of doing business between Empacadora Mexicana, S.A., and Rico, Inc., is "in the ordinary course of trade," and whether the price charged by the exporter "fairly reflects the market value."

In view of these issues, it is not necessary to consider the other elements entering into export value under section 402 (b), *supra.*

The question first presented, as to whether the manner of doing business by Rico, Inc., and Empacadora Mexicana, S.A., is the ordinary course of trade, is in my opinion controlled by the decision in *Chr. Bjelland & Co. Inc.* v. *United States*, 52 CCPA 38, C.A.D. 855. However, before considering the holding in the Bjelland case, *supra*, I deem it appropriate to observe that the manner of doing business between the respective parties has been the same from 1958 to the date of trial. This, in and of itself, is indicative of the fact that, insofar as the importer and exporter involved herein are concerned, it is the ordinary course of trade. In the *Bjelland* case, *supra*, the Court of Customs and Patent Appeals made the following comment:

We agree with the Customs Court that:

> * * * there may well be instances wherein there is more than one manner of doing business which would constitute the "ordinary course of trade." This is particularly so in an instance such as is involved herein, where the exporter is accountable for a substantial, if not major, portion of the sales to the United States of brisling sardines and kipper snacks. * * *

We do not think that the intent of the statutory provision, as indicated above by quotations taken from the Hearings, would be served by a

refusal to recognize that segments of a particular industry may deal under different conditions. While an entire industry may normally do business in the same manner, a choice of a convenient manner of doing business at some variance with the others cannot exempt the parties from the force of section 402(b). This is particularly the case where, as the Customs Court correctly analyzed the evidence, the business of appellant and the exporter represents a substantial portion of the industry sales in the kind of merchandise at bar, and thus represents a substantial manner of doing business. The evidence tends to substantiate that appellant is the largest single importer of the items at bar, and the trade conditions and provisions under which it has done so have existed for some time. Accordingly, we do not find that the manner of doing business here to be outside the "ordinary course of trade" or to require the export value to be based on actual sales or offers thereof by *others* in the industry. *United States* v. *Acme Steel Co.*, 51 CCPA 81, 87, C.A.D. 841. [Emphasis quoted.]

I am of the opinion that the exporter herein who accounts for 25 percent to 35 percent of the total Mexican production of frozen strawberries represents a substantial portion of the trade. While there may be other methods of doing business in the industry, I do not find the manner of doing business by Rico, Inc., and Empacadora Mexicana, S.A., to be outside the ordinary course of trade. Accordingly, there is no necessity to find a value based upon sales by others if in truth and in fact the price between the related persons fairly reflects the market value. I, of course, can and will consider sales by other packers of frozen strawberries from Mexico not for the purpose of establishing value but merely as a guide to determine if the price fairly reflects the market value.

At this juncture, I deem it appropriate to note that the appraisements herein were made on the basis of "similar" merchandise. Under section 402, as amended, *supra*, frozen strawberries in 30-pound cans of a particular grade produced in the same country by different packers constitutes "such" rather than "similar" merchandise. Defendant in its brief by making the following statement acknowledges this view.

* * * There is no evidence of record that the strawberry products at bar are in any way distinguishable by virtue of quality, label or brand from the berries marketed by the other packers in Mexico.

Accordingly, appraisement should have been made on the basis of export value of "such" merchandise as defined in section 402(f), 4(A) or (B) depending upon whether the appraiser was utilizing the berries produced by the exporter herein or another producer in the same country. I am, however, of the opinion that such error is of no consequence since obviously the value found by the appraiser would have been the same. The error appears to be one of terminology rather than an improper selection of other merchandise and may have oc-

curred as a result of failing to take into consideration the amendment to section 402 which now includes two categories of "such" merchandise.

A review of the record establishes at least two known costs which the exporter herein does not incur, i.e., 4 cents per pound differential between f.o.b. plant and f.o.b. Laredo, Tex., and a commission to a food broker. The former naturally comes out of the price to the exporter. The latter, the record establishes, also comes out of that price. The food broker's commission, insofar as the record herein establishes, runs 4, 5, 6, or 7 percent depending upon arrangements.

Considering the invoiced prices of 11 cents, 11.5 cents or 12 cents per pound and adding to it the 4 cents per pound differential, as well as a commission, in my opinion brings the price clearly within the range of fairly reflecting the market value. While the record does establish a slight variation in price in some instances even when these factors are taken into consideration this deviation is not such as would constitute a disparity in price, which would result in a finding that the price does not fairly reflect the market value. Moreover the record does establish the existence of certain other expenses, such as financing charges, which according to the record run from 8 percent to 12 percent in Mexico, and warehouse charges for storage. Although no set figure is given for either of these factors, they have been established to actually exist and can certainly be considered factors in reducing the net price. However, mathematically speaking, where a slight variation does occur, it is not of such a nature, even without considering the financing and warehouse charges, as to result in a finding that the invoice prices do not fairly reflect the market value.

Accordingly, I find as matters of fact:

1. The merchandise involved in the instant appeals for reappraisement consists of frozen strawberries and strawberry puree exported from Mexico between, on, or about April 2, 1958, and on or about July 8, 1963.

2. Said merchandise was appraised on the basis of the export value of similar merchandise under section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

3. The invoice prices represent the selling prices of the instant merchandise for exportation to the United States.

4. Said merchandise does not appear on the Secretary's Final List, T.D. 54521.

5. Said merchandise was sold by Empacadora Mexicana, S.A., in the ordinary course of trade to Rico, Inc., El Paso, Tex., a purchaser at wholesale, without restrictions as to the disposition or use of the merchandise by the purchaser.

6. Said merchandise was not sold for exportation to the United States at different prices for different quantities.

7. Empacadora Mexicana, S.A., was accountable for a substantial portion of the sales to the United States of frozen strawberries and strawberry puree.

8. The invoice prices fairly reflect the market value of the merchandise for exportation to the United States.

9. At the time of exportation to the United States, the invoice prices were the prices at which the merchandise was freely sold to Rico, Inc., in Silao, Mexico, one of the principal markets of Mexico, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, including the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

I, therefore, conclude as matters of law:

1. Export value, as defined in section 402(b), Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis for the determination of the value of the merchandise covered by the instant appeals for reappraisement.

2. Such value is set forth in finding of fact numbered 9 above.

Judgment will be entered accordingly.