**UNITED STATES**

v.

**LOCKWOOD & FREIDIN.**

**A.R.D. 241; Reappraisement R59/9242 and 75 others.**

United States Customs Court,
Third Division, Appellate Term.

July 18, 1968.

Edwin L. Weisl, Jr., Asst. Atty. Gen., (Sheila N. Ziff, New York City, trial attorney), for appellant.

Barnes, Richardson & Colburn, New York City, (Joseph Schwartz, New York City, of counsel), Harold Orlinsky, Associate Counsel, for appellee.

Before RICHARDSON and LANDIS, Judges.

LANDIS, Judge:

This matter comes up on application to review the decision and judgment of the single judge, after trial, holding that the amount of export value proper for canned frozen strawberries and strawberry puree, exported from Mexico during the period April 2, 1958, to July 8, 1963, was the claimed invoice prices rather than the appraised unit prices. Lockwood & Freidin v. United States, 58 Cust.Ct. 622, R.D. 11273.

The shipments, too numerous to recount, were serviced by Lockwood & Freidin, customhouse brokers at Laredo, Texas. They are all covered by the 76 appeals for reappraisement listed in schedule A, attached to and made a part of this decision, consolidated for trial to test the appraisements under section 402 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, T.D. 54165.

There is no issue as to valuation basis under section 402, as amended. Frozen strawberries are not on the final list published by the Secretary of the Treasury, T.D. 54521, pursuant to the 1956 Simplification Act, supra. The strawberries were appraised on export value basis. Export value is the claimed and preferred statutory basis under section 402, as amended, where it is defined as follows:

(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

The dispute as to the amount of export value is set in the fact that the

packer of the imported strawberries, Empacadora Mexicana, S. A. (hereinafter referred to as Empacadora), sold them at a price somewhat less than that at which other packers sold identical or similar strawberries for export to the United States. All of the packers are located in the region identified as Guanajuato, Mexico, where the strawberries are principally grown. Empacadora sold its entire output, year in and year out, to Rico, Inc., El Paso, Texas, the actual importer in these appeals, at invoice unit prices ranging from 9 cents to 12 cents per pound, f.o.b. Silao, Mexico. (Exhibit 1.) The appraiser valued the Empacadora strawberries at unit prices ranging from 9 cents to 16.5 cents per pound, net packed. (Exhibit A.) The appraised unit prices are concededly based on the price at which other packers sold identical or similar strawberries for export to the United States. Appellant's counsel avers that the difference in the invoice and appraised prices averages out to about 1½ or 2½ cents per pound.

The overall question briefed below and argued here is which of the two, the invoiced or appraised unit prices, represents the price at which the imported strawberries were freely sold, in the ordinary course of trade, at the time of exportation to the United States. Section 402(b), as amended, supra. The terms "freely sold" and "ordinary course of trade" are defined in section 402, as amended, as follows:

Section 402(f):

DEFINITIONS. (f) For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

(2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

What we have are appraisements at unit prices at which other packers freely sold merchandise identical or similar to the imported strawberries to all purchasers at wholesale, and invoice unit prices at which Empacadora sold the imported strawberries to one selected purchaser, Rico, Inc. The appraised unit prices are presumptively correct. However, the statute specifically says that, where it can be satisfactorily determined, the first category of merchandise upon which export value shall be taken is the merchandise undergoing appraisement or identical merchandise produced in the same country by the same person rather than by another person. Section 402(f) (4) (A). It further specifies that sales to a selected purchaser will be considered as "freely sold" provided they are made "in the ordinary course of trade * * * at a price which fairly reflects the market value of the merchandise." United States v. Acme Steel Company, 51 CCPA 81, C.A. D. 841; Chr. Bjelland & Co., Inc. v. United States, 52 CCPA 38, C.A.D. 855.

■ The trial judge concluded that Empacadora's sales to Rico, Inc., while essentially different from the way other packers sold for export, as we shall discuss, infra, were in the ordinary course

of trade because, as he found, the two had been doing business the same way since 1958, and their export-import business represented anywhere from 25 percent to 35 percent of the Mexican export business in frozen strawberries, citing *Bjelland,* supra. Appellant admits that to the extent that Empacadora is a major packer and sells to a selected purchaser, the facts are similar to the factual situation appertaining in *Bjelland,* supra. (Appellant's brief, page 30.) But says appellant those facts were only incidental to the question of "ordinary course of trade" in *Bjelland* and that more important was the fact that *Bjelland's* merchandise sold under a well-recognized label which gave it an intrinsic value over and above that of identical or similar merchandise of a different brand. The argument is neatly turned. The difficulty is that it would refute the definition of "ordinary course of trade" in section 402(f) (2). As we read *Bjelland,* the value of a well-recognized brand product was a substantively different question from whether the business in that product was in the ordinary course of trade. The factors which determine the "ordinary course of trade" as defined in section 402(f) (2) are the conditions and practices normal in the trade with respect to merchandise of the same class or kind as that under appraisement. Our appeals court was of the same opinion when it stated:

> * * * We are comparing the course of trade of others with that herein, with respect to brisling sardines and kipper snacks. Brisling sardines and kipper snacks are the only class or kind of merchandise the trade in which we must determine is or is not ordinary. * * *. [*Bjelland,* supra, 52 CCPA at page 45.]

It was in that context that the appeals court went on to say:

> * * * The evidence tends to substantiate that appellant is the largest single importer of the items at bar, and the trade conditions and provisions under which it has done so have existed for some time. Accordingly, we do not find that the manner of doing business here to be outside the "ordinary course of trade" or to require the export value to be based on actual sales or offers thereof by *others* in the industry. United States v. Acme Steel Co., 31 [51] CCPA 81, 87, C.A.D. 841. [Emphasis quoted. *Bjelland,* supra, 52 CCPA at page 46.]

There is the same kind of evidence here. It likewise tends to substantiate that Empacadora's sales to Rico, Inc., were in the ordinary course of trade and we so find.

■ Do Empacadora's invoice prices to Rico, Inc., fairly reflect the market value of the export strawberries? The trial judge held that they did. Appellant argues that the proofs are "too diffuse, too general and, with respect to warehouse charges, nonexistent, to enable the court to determine whether the costs allegedly borne by other processors in Mexico accounted for the differential between their prices and Empacadora's." (Appellant's brief, page 38.) We do not read the record quite that way.

It is a fact that, in its business with Rico, Inc., Empacadora saves a good deal on expenses that the other packers incur. All the packers finance the growers of the strawberries. Empacadora does it with money loaned by Rico, Inc., without interest. The other packers do it with borrowed money on which they pay interest. Empacadora holds its strawberries no longer than it takes to process and ship them out. It thus avoids the expense of storage in a warehouse. The other packers have the expense of warehousing their processed strawberries until they get an export order. Empacadora does not have to pay a commission on sales. It negotiates its prices with Rico, Inc., in advance of the harvest which starts in January and continues through June of each year. The other packers sell through commission food brokers in the United States. The food brokers commission can be 4, 5, 6, or 7 percent, depending on arrange-

ments, and is part of the price for export. Empacadora's price is f.o.b. Silao, Mexico. Rico, Inc., assumes all the shipping expenses incidental thereto. The other packers sell f.o.b., Laredo, Texas, or other ports of delivery in the United States. The record states that the other packers also freely offer their strawberries for sale f.o.b. Irapuato, Mexico. We find no evidence that a sale was ever made f.o.b. Irapuato. Silao and Irapuato are about 20 some odd miles apart. The price differential f.o.b. Irapuato and f.o.b. Laredo, attributable to freight, is 4 cents per pound. There is also evidence that the other packers ship only against commissioned orders at a price which reflects, as best as can be determined, the going market price at the time of exportation. However, such shipments are subject to agreement, between the commission agents and the United States customer, that the price paid will be in accordance with the prevailing price of strawberries in the United States at the time of delivery. (Defendant's exhibit F, page 2.) The packers accept the risk that the price may decline between the time of exportation and the time of delivery. Empacadora suffers no such risk on its sales to Rico, Inc. One additional fact should be noted. The appraised unit prices, as near as we can make out, are prices adjusted off the f.o.b. delivered price to the United States of the other packers. The appraiser apparently deducted nondutiable expenses from the f.o.b. delivered price to arrive at a computed export value, f.o.b. Irapuato, Mexico, at the time of exportation. We reason this because the other packers f.o.b. delivered prices in the United States (exhibits B, C, D) were considerably in excess of the appraised unit prices.

Appellant argues that the above facts do not constitute substantial, competent evidence, of the difference in Empacadora's invoice price and the price of other packers, upon which to sustain the claim that Empacadora's invoice prices fairly reflect market value. The evidence is competent. In our opinion, it is also substantial.

The Supreme Court has defined "substantial evidence" as evidence affording a substantial basis of fact from which the fact in issue can be reasonably inferred. Substantial evidence, said the Court further, is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury. * * * [Brooks Paper Company v. United States, 40 CCPA 38, 45, C.A.D. 495.]

Appellant relies on a line of cases holding that a manufacturer's export price, when it is less than his home market price for identical merchandise, cannot be said to fairly reflect market value in the absence of proofs breaking down the specific cost items, and the amounts thereof which allegedly made up the difference.

■■ The problem is, of course, the degree and quantum of proof required in a particular case. J. E. Bernard & Co., Inc. v. United States, 58 Cust.Ct. 598, R.D. 11265, cited by appellant. We believe that the proofs in this record are sufficiently specific to meet the holding, alluded to above, in the cases relied on by appellant. To those who may think the proofs are not, we would distinguish those cases on the ground that a manufacturer who sells his merchandise at a different price for home consumption than for export, should be held to a greater degree of proof to explain the difference in prices, than should a manufacturer who sells only for export, and is asked to explain the difference between his price and that of his competitors for identical merchandise, which is Empacadora's factual situation here. The one manufacturer has the best evidence of the difference in his prices in his own records. Empacadora could not so easily get the record or cooperation of its competitors. The proofs adduced in

this case bear this out. It is not appellee's proofs which establish the 4 cents differential in the f.o.b. plant and f.o.b. Laredo price of other packers, or the amount of commission paid by the other packers. It is appellant's proofs, in the testimony of Mr. George Bernhardt, a commission food broker, and the customs investigation report. (Exhibit F.)

We find nothing diffuse or general about the two known costs included in the price of other packers found by the trial judge, "i. e., 4 cents per pound differential between f. o. b. plant and f. o. b. Laredo, Tex., and a commission to a food broker." Lockwood & Freidin v. United States, supra, at page 627.

Those costs are undisputed and, as the trial judge computed, if you add them to the claimed invoice prices and weigh in the additional factors of expense to the other packers of strawberries, not incurred by Empacadora, the claimed invoice prices are clearly within the range of a price that fairly reflects the market value. The fact that the considered cost items do not adjust the difference to the penny is not fatal. We agree with the trial judge who said:

* * * Plaintiff tried the case and has briefed it on the theory that to prevail it must compare the invoice prices with Canadian home market prices (where Aimco is the sole producer) for such or similar merchandise, and must justify any differences shown with differences in the conditions and cost of serving the home market. A difference not so ac-

counted for would compel me to find that plaintiff had failed to show that the invoice prices fairly reflected market value, no other standard of measurement being available. I do not understand this to mean, however, that the home market prices must, after adjustments I approve, exactly correspond. I would be satisfied with a reasonable approximation of correspondence: this I deduce from the word "fairly." If plaintiff fails to show such approximation, I cannot find an export value and, therefore, the appraisement based on constructed value must stand. [C. J. Tower & Sons of Buffalo, Inc. v. United States, 56 Cust.Ct. 653, 660, Reap. Dec. 11152, review dismissed Id. v. Id., 57 Cust.Ct. 749, A.R.D. 213.]

There being substantial evidence to support the facts found by the trial judge, we adopt those findings, along with the conclusions, and incorporate them by reference here.

. The judgment, that the claimed invoice prices are the export value of the imported strawberries, is affirmed. (The claimed invoice prices should be distinguished from the entered unit prices based on special invoices prepared and filed with some of the entries we have examined to meet contemplated advances by the appraiser. See entries in R63/3689.)