(A.R.D. 287)

UNITED STATES v. BUD BERMAN SPORTSWEAR, INC.

Third Division, Appellate Term

(Decided May 3, 1971)

*L. Patrick Gray, III,* Assistant Attorney General (*Herbert P. Larsen,* trial attorney), for the appellant.

*Barnes, Richardson & Colburn* (*Norman C. Schwartz* of counsel) for the appellee.

Before RICHARDSON and LANDIS, Judges, and
ROSENSTEIN, Senior Judge

ROSENSTEIN, Judge: This is an application for review of the decision and judgment of Chief Judge Paul P. Rao in *Bud Berman Sportswear, Inc.* v. *United States,* 63 Cust. Ct. 605, R.D. 11683 (1969), which sustained the importer's claimed values for men's cotton dress shirts manufactured and sold by Nippon Iryo Co., Ltd. of Nagoya, Japan (hereinafter called Nippon) and imported by Bud Berman Sportswear, Inc. of New York (hereinafter called Bud Berman). The

merchandise, exported from Japan on April 12, 1966, was entered at the invoiced unit "ex-factory" prices and appraised[1] on the basis of export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, of "such" merchandise, as defined in sections 402(f)(4)(A) of said Act, as amended, *supra*, at "col. X units of value per doz. net pkd", which was 30 cents higher than as entered. Neither party challenges the basis of appraisement.

The case was submitted upon two exhibits (1 and A) and a stipulation reading in pertinent part:

> That in arriving at his advisory values [line examiner] Mr. Fitchtenbaum determined that such merchandise was freely sold or offered for sale for exportation to the United States only at a price which included, as an integral part thereof, delivery by the seller F.O.B. ship, and he therefore added to the "ex-factory" prices invoiced in the instant entry an amount which he determined in each instance to be the pro-rata share of the invoiced "Handling Charges Paid For Your Behalf," equalling 30¢ per dozen, when rounded off to the nearest cent.

> \*　　\*　　\*　　\*　　\*　　\*　　\*

> That the sole issue herein is whether, at the time of exportation to the United States, such or similar mechandise was freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States on an ex-factory basis.

Exhibit 1 consists of an affidavit of Shoji Yamada, a manager in the trade department of Nippon (formerly known as Chubu Iryo Co., Ltd.) with copies of all agreements between Nippon and Bud Berman. Yamada states:

> \* \* \* it is now and always has been the policy of the company to negotiate prices on the basis of ex-factory.

and that—

> At all times, any customer who so desires was free to take delivery at the factory, and to utilize his own truckers, warehousemen and freight forwarders for the onward shipment of the merchandise; and in such case, payment of the agreed ex-factory price would complete the transaction.

The first two contracts, dated December 25, 1961 and May 18, 1962, respectively, specified f.o.b. Japan prices, and limited sales of dress

---

[1] It was stipulated that the advisory appraisements, which were made in terms of single unit prices, as indicated by the line examiner's notations on the invoice, were adopted by the assistant appraiser (a fact noted on the summary sheet accompanying the entry).

shirts for importation into the United States to the buyer provided it purchased a specified minimum amount.[2]

The next contract, dated March 6, 1963, which specified an "f.o.b. Nagoya" price, was amended that same date by another agreement providing that, commencing with the fall 1963 shipments, payment was to be on an "ex-factory" basis which "shall be determined by taking the F.O.B. prices already agreed upon, and subtracting therefrom the flat sum of 25 cents per dozen." The sellers agreed to have the shirts shipped to and placed on board "as they have done in the past"; to pay on behalf of the buyers the necessary costs incurred therein; and to show such costs on their invoice, with substantiating documents. However, actual title to the goods would not pass until all conditions of the irrevocable letter of credit were met by the sellers. All charges between the seller's factory and the pier in Nagoya were to be actual and not estimated costs.[3]

An agreement, dated August 23, 1963, to be effective for one year commencing October 1st, 1963, provided for an "F.O.B. Price per dozen", and stated that "Other terms not specified in this agreement remain same with the Agreement, dated 25th December 1961."

The three ensuing contracts, dated January 13, July 4, and December 7, 1964, respectively, set out the "prices agreed upon for this purchase F.O.B. Japan in U.S. dollars" and provided that—

> If the Buyer elects to take delivery at the factory and assume the responsibility and cost of arranging for the transportation from the factory to the vessel, the foregoing prices will be reduced accordingly. It is estimated that such transportation costs are 25¢ per dozen.[4]

Exhibit A is a report, with attached documents, dated March 17, 1969, of Regional Customs Representative John A. Dresser, relative to an inquiry into Nippon's relations with Bud Berman, and is based, in the main, on an interview with Shoji Yamada, the affiant of exhibit 1. The report states that the initial sales to Bud Berman were made on an f.o.b. Japan basis, and that—

> About six months after the initial sales were made to Berman, Mr. Berman came to Nagoya and asked Nippon to invoice the

---

[2] The restriction was modified in 1964 to allow sales of synthetic dress shirts to others with Bud Berman's consent.

[3] Under another amendment of the same date, if the actual invoiced costs were less than 25 cents per dozen, the buyer would pay the difference between such costs and 25 cents; if more, the seller would refund the difference to the buyer.

[4] The estimate was changed to 30 cents in the contract of December 7, 1964. The contracts also implemented and amended the basic agreement of December 25, 1961 "as later amended from time to time", and were to apply in any case where inconsistent with the basic agreement as amended.

merchandise on an "ex-factory" basis rather than on the FOB basis. Nippon preferred to use the FOB basis according to Mr. Yamada, but agreed to make the ex-factory invoices as requested. Therefore, subsequent invoices were made out on an ex-factory basis as per *Exhibit B*, invoice BUD–61B. However, examination of Nippon's ledger sheet (*Exhibit BB*) for this transaction on February 17, shows yen unit values higher than those in Exhibit B, and under the date of February 18, shows a total yen payment received of ¥8,561,714 equivalent to US$23,782.54, the FOB value of the shipment. * * *

\* \* \* \* \* \* \*

A random verification of other sales to Bud Berman was made from the sales ledger and the amounts shown in the ledger as payment received from Bud Berman were found to agree with the FOB Nagoya total of the invoices covering each shipment.

\* \* \* \* \* \* \*

Included in the total FOB Nagoya sales price to Berman were the various charges incurred in moving the merchandise from the factory to the dock (go-down) in Nagoya and loading the merchandise aboard the vessel. These charges were calculated for invoicing purposes at $0.25 per dozen shirts and $0.30 per dozen shirts according to "agreements" with Bud Berman. Mr. Yamada could not locate copies of these "agreements".

Nippon contracted with a Customs Broker, Oguribashi Unyu,[5] Nagoya, Japan, to handle the movement of Berman's merchandise from the go-down to the ship and to load it on the ship. Oguri invoiced Nippon for this service and Nippon made a yen payment to Oguri to cover the invoice. If Nippon made the shirts at the Nishio Plant, the additional cost of shipping them to Nagoya was absorbed by Nippon.

\* \* \* \* \* \* \*

Bud Berman paid Nippon the full FOB Nagoya value of each export invoice by letter of credit. The entries of these payments in the "sales ledger" are noted above.

\* \* \* \* \* \* \*

Mr. Yamada stated that Nippon sold similar merchandise to Crestwood Imports, New York, N.Y. These shirts were sold on an FOB Nagoya basis and shipped to Modas Ana Representations, Santures, Puerto Rico. * * *

The trial judge found that the appraisement was separable (based on the stipulation as to the appraiser's action herein); that Bud Berman was a selected purchaser which purchased the shirts at the invoiced unit ex-factory prices; and that the seller arranged to deliver the merchandise on board ship and to pay the handling charges incurred therewith on behalf of the buyer. He concluded—

[5] Noboru Kato, chief of Oguribashi's business department, told Dresser that he charged Nippon at flat rate per ton, which included storage at the go-down, measuring, lighterage, loading, trucking, and other extra charges exclusive of insurance, to handle Bud Berman's shirts, plus a flat fee per shipment for customs clearance.

4. That in view of the stipulation * * * the appraisement is deemed to be separable and the invoice unit prices are clothed with a presumption of correctness.

5. That the merchandise was sold, or in the absence of sales, freely offered for sale within the meaning of section 402(f) (1) of the Tariff Act of 1930, as amended, on an ex-factory basis.

6. That the invoice unit ex-factory prices, without the handling charges, represent the export values of each of the items of merchandise involved herein.

Section 402, as amended by the Customs Simplification Act of 1956, reads in pertinent part as follows—

(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

\* \* \* \* \* \* \*

(f) DEFINITIONS.—For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

Appellant does not dispute the trial court's finding that, during the period in question, sales of the shirts at bar were restricted to Bud Berman, but argues that the "entire concept of 'separable appraisement' is foreign to the 'selected purchaser' situation."

We do not agree. Although an appraisement which is expressed in terms of a single unit price is ordinarily not considered to be separable, *S. S. Kresge Co. et al. v. United States*, 45 Cust. Ct. 469, R.D. 9778 (1960), where it is shown that the examiner took the invoiced ex-factory price and added thereto the charges subsequently accruing, as shown on the invoice, to arrive at the f.o.b. port of exportation value, the appraisement is constructively separable into ex-factory

cost, plus charges. *Bud Berman Sportswear, Inc.* v. *United States*, 55 Cust. Ct. 574, R.D. 11056 (1965), affirmed *United States* v. *Bud Berman Sportswear, Inc.*, 57 Cust. Ct. 733, A.R.D. 211 (1966), affirmed *Id.* v. *Id.*, 55 CCPA 28, C.A.D. 929 (1967).[6]

We are unable to find judicial precedent for limiting the applicability of the separable appraisement principle to section 402(f) (1) (A) "purchasers at wholesale" and to exclude therefrom section 402(f) (1) (B) "selected purchasers at wholesale"; and we find no basis for introducing it here. To remove the latter group from the benefits of this rule and to require that an importer who is a selected purchaser produce the full panoply of proofs as to every element of the claimed statutory export value is unacceptable discriminatory treatment of a class of purchasers now expressly recognized by statute as coming within the export value formula.

Accordingly, we find, on the stipulation of record, that the appraisements herein are separable and that appellee is entitled to rely upon the presumption of correctness attaching to the invoiced unit ex-factory prices, providing that it has established the other elements of statutory export value. And that brings us to the heart of this case and to a fundamental issue underlying all others raised by appellant, namely, the scope of the separability rule with respect to the proofs to be adduced by appellee in establishing its claimed export values.

Whatever questions existed as to the applicability of that rule, as expounded by our appellate court in *United States* v. *Chadwick-Miller Importers, Inc., et al.*, 54 CCPA 93, C.A.D. 914 (1967), and *United States* v. *Bud Berman Sportswear, Inc.*, 55 CCPA 28, C.A.D. 929 (1967), have hopefully been resolved by two recent opinions of that court in *United States* v. *Pan American Import Corp. et al.*, 57 CCPA 134, C.A.D. 993 (1970), and *B & W Wholesale Co., Inc.* v. *United States*, 58 CCPA 92, C.A.D. 1010 (1971). The learned Chief Judge of this Court, in rendering the decision under review on November 28, 1969, could not have anticipated the *Pan American* decision of 1970 and the *B & W Wholesale Co.* in 1971. They establish standards of proof that did not clearly exist prior thereto. In these two cases, the court has marked out the metes and bounds of the separability doctrine and denoted the burden of proof a party plaintiff must meet "in order to bring the separability rule into effect and thereby to prevail."[7]

[6] The third paragraph of the stipulation before us apparently follows closely the testimony of Examiner Fichtenbaum in the earlier cited *Bud Berman*, regarding the mechanics of his appraisement therein. In that case, it was held to be constructively separable, so that plaintiff (a purchaser at wholesale) might rely upon the presumption of correctness attaching to the ex-factory prices, and challenge only the added inland charges.

[7] *United States* v. *Pan American Import Corp. et al.*, *supra*.

In *Pan American*, the court reversed the Appellate Term,[8] stating:

> \* \* \* In the former [*Chadwick-Miller*], this court held, in essence, that, where a separable appraisement is involved, once an importer has shown that the merchandise was freely sold or offered for sale to *all* purchasers, in the principal markets, in the usual wholesale quantities, on an *ex-factory* basis, then the separability rule will give rise to a presumption that the ex-factory price which the appraiser found was *the* price at which the merchandise was freely sold or offered to all.

> \*       \*       \*       \*       \*       \*       \*

> \* \* \* The question before us, which we held to be settled by application of the separability rule presumption, related only to the *price* at which the goods were sold or offered ex-factory. \* \* \*

> \*       \*       \*       \*       \*       \*       \*

Similarly, in *Bud Berman*, which followed *Chadwick-Miller*, we said:

> We do not think that the Customs Court necessarily acted improperly in its derivation here of the subsidiary presumption that the ex-factory *price* used by the appraiser is the one offered to all, *if, in fact, an ex-factory price is offered to all.*

> \*       \*       \*       \*       \*       \*       \*

Inasmuch as under *Chadwick-Miller* and *Bud Berman* appellees must show that the involved merchandise was *freely sold or offered* to *all* purchasers on an ex-factory basis, and inasmuch as the Appellate Term held that appellees need show no more than that the merchandise was sold *to appellees* on an ex-factory basis, the Appellate Term did not consider the appellees' evidence in light of the applicable burden of proof. \* \* \* [Emphasis copied.]

In *B & W Wholesale*, where the appraiser had added inland charges to the invoiced and entered ex-factory prices in determining the export value of the merchandise, the court stated:

> \* \* \* However, because the record is barren of evidence indicating in what specific respect or respects the appraiser found the claimed ex-factory prices did not satisfy the statutory definition of export value, neither we nor the Customs Court may presume, as the Government would have us do, that the subject merchandise was not "freely sold to all purchasers by the manufacturers on an ex-factory basis." *Mannesmann-Meer, Inc.* v. *United States*, 58 CCPA 6, C.A.D. 995 (decided Oct. 29, 1970). Nevertheless, there is still a presumption of correctness attaching to the appraiser's *result* which is independent of the presumption of correctness attaching to the appraiser's subsidiary findings, and B & W therefore had the burden of proving that merchandise like or similar to the instant importation was *sold or offered for sale in accordance with the statutory definition of export value at the claimed ex-*

---

[8] *Pan American Import Corp. et al.* v. *United States*, 61 Cust. Ct. 619, A.R.D. 248, 292 F. Supp. 718 (1968).

*factory prices* or at the alternatively claimed "ex-godown" prices.[2] *A. Zerkowitz & Co.* v. *United States, supra.* [Emphasis added except for "result".]

The single judge held that the importer had failed to establish by a preponderance of the evidence both that merchandise like or similar to the instant merchandise " was freely sold [3] by the manufacturers ex-factory" and "what the ex-factory price was, if any." [4] The Appellate Term affirmed, holding that appellant had failed to prove "that the merchandise was offered for sale in accordance with statutory export value at the claimed ex-factory prices." [5]

The court also stated, in footnote 4: [9]

We note appellant's contention that, because the appraiser expressed his finding of value as an "ex-factory price" (i.e., the price at which the appellant entered the goods) plus the controverted charges, the appraisement is separable and that it is therefore entitled to rely upon the appraiser's determination that the price at which it had entered the goods was the ex-factory price. However, even assuming that this be so, the question is not what the ex-factory component of the appraised value was, but rather whether merchandise like or similar to the instant merchandise was in fact freely sold or offered for sale, in accordance with the statutory definition of export value, at that ex-factory price. We agree with the Government that "the 'separability' doctrine does *not* relieve the appellant of proving that the merchandise in question was *freely* sold or offered for sale" at that price and not at a price one component of which was that price. *United States* v. *Pan American Import Corp.*, 57 CCPA 134, 428 F. 2d 848, C.A.D. 993 (1970).

Although *Pan American* and *B & W Wholesale* deal with the separability doctrine where it is claimed that merchandise is "freely sold" under section 402(b) at ex-factory prices "to all purchasers at wholesale" within the meaning of section 402(f)(1)(A), the standards of proof spelled out in those cases are equally applicable in establishing that goods are freely sold under the export value formula to "selected purchasers at wholesale" within the framework of the definition contained in section 402(f)(1)(B).

Thus, in the latter situation, the doctrine of severability is not reached until the importer has shown that the goods were sold in the ordinary course of trade to a selected purchaser at wholesale at a price which fairly reflected the market value of the merchandise on an ex-factory basis. Only then, when he has established that the goods were "freely sold" within the meaning of the statute, may plaintiff rely upon the presumption of correctness attaching to the ex-factory price utilized by the appraiser in finding value. The importer who is a selected purchaser is not relieved from his burden of establishing that

---

[9] Footnotes 2, 3 and 5 omitted.

the transactions at bar were "in the ordinary course of trade" and that the claimed prices fairly reflected the market value of the imported merchandise.

The proofs required under section 402(f) (1) (B) were listed by Senior Judge Wilson in *Joseph A. Paredes & Co., a/c Andrew D. Darvas Co.* v. *United States*, 63 Cust. Ct. 557, R.D. 11675 (1969), wherein plaintiff claimed that the invoiced unit prices, less certain added charges, represented export value, and that they were the sales prices to selected purchasers within the meaning of section 402(f) (1) (B). The Judge stated:

> Two primary issues are presented by the record herein, to wit: (1) whether the appraisements are separable, and (2) whether the sales prices to the importer herein are sales in the ordinary course of trade to a selected purchaser at wholesale which fairly reflect the market value of the merchandise.
>
> With respect to the separability issue, the appraisements in the cases at bar added 25 percent to the invoiced unit prices.
>
> \*    \*    \*    \*    \*    \*    \*
>
> Accordingly, I am of the opinion that the instant appraisements are separable and that plaintiff is entitled to rely upon the presumption of correctness attaching to the appraiser's returns with respect to all elements of the appraisements except the contested 25 percent addition. *Park Avenue Imports* v. *United States*, *supra*. This, however, does not relieve the plaintiff from offering evidence to the effect that its claimed prices are in fact sales prices to a selected purchaser at wholesale where he bought for resale otherwise than at retail at prices which fairly reflected the market value of the imported merchandise.
>
> \*    \*    \*    \*    \*    \*    \*
>
> \* \* \* Such sales were in the ordinary course of trade of the exporter under the principle stated in *Chr. Bjelland & Co., Inc.* v. *United States*, 52 CCPA 38, C.A.D. 855 (1965), and *United States* v. *Lockwood & Freidin*, 61 Cust. Ct. 573, A.R.D. 241 (1968). Nevertheless, it was plaintiff's burden to establish that its claimed values fairly reflected the market value of the imported merchandise. The variances in price, and reasons therefore, together with "bargaining" or "negotiating" as stated in the affidavit, exhibit 4, do not aid in establishing a fairly reflected market value for the imported merchandise. \* \* \*

The record before us is lacking in substantial competent proof in these areas. As to the "ordinary course of trade," [10] we are unable to determine the conditions and practices normal in the trade in Japan

---

[10] Section 402 (f) (2) provides that—

    The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

with respect to shirts of the same class or kind as those at bar. *Reliance Trading Corporation of Illinois* v. *United States*, 63 Cust. Ct. 675, A.R.D. 260 (1969) (appeal pending) ; *Inter-Maritime Fwdg. Co., Inc.* v. *United States*, 51 Cust. Ct. 529, A.R.D. 162 (1963). Yamada's statement as to company "policy" does not indicate the *actual practice*, whatever it might be. Moreover, it is refuted by Dresser's report that Yamada had advised him that Nippon preferred "to use the FOB basis", and that similar merchandise was sold to a New York firm on an f.o.b. Nagoya basis.

Nor is there any affirmative showing that the alleged ex-factory sales prices to Bud Berman fairly reflected the market value of the merchandise. *Delmonico International Corp.* v. *United States*, 52 Cust. Ct. 656, A.R.D. 176 (1964) ; *American Hydrolan Corp. et al.* v. *United States*, 64 Cust. Ct. 672, R.D. 11700 (1970) ; *Joseph A. Paredes & Co., a/c Andrew D. Darvas Co.* v. *United States, supra.*

As to the other issues raised by this appeal, a study of the exhibits, the pertinent parts of which are summarized *supra*, and the invoices [11] convinces us that appellee has failed to overcome the presumption of correctness attaching to the appraiser's finding that the transaction at bar was made on an f.o.b. basis which included the "handling" charges; [12] that the contracts were in fact geared to an f.o.b. selling price; that the "options" referred to in the contracts, expressed in terms of f.o.b. prices less 25 or 30 cents and conditioned upon the buyer's willingness to take delivery at the factory and assume responsibility for placing the merchandise on board the vessel, were never accepted; and that the change in the invoicing to an "ex-factory" basis did not reflect a change in the manner of doing business, but was a transparent attempt to disguise the true nature of the transaction.

Furthermore, whether the alleged "offers" to sell ex-factory were *bona fide* or spurious is a question we need not reach in view of our findings; [13] it is what is actually done in terms of sales which establishes a market price, and not merely what it is possible to do. Willingness to sell merchandise at a price is no evidence of a market price. "By the same token, the fact that merchandise *could have been sold* at a price is no evidence of a market price either." [Emphasis copied.]

---

[11] The Special Customs Invoice indicates that no sales were made at an ex-factory price.

[12] Appellee's counsel conceded, on the oral argument, that it was "a little in the gray area" as to whether Bud Berman actually bought ex-factory or f.o.b. Perhaps anticipating our findings, it is suggested in appellee's brief that, should we find the instant transaction to have been on an f.o.b. basis, we also find that the merchandise was freely offered to all purchasers for exportation to the United States "either on an ex-factory basis or on an F.O.B. vessel basis, at the purchaser's option."

[13] For the same reason, we do not consider the issue, raised by appellant, whether the sums invoiced as "Handling charges paid for your behalf" represent actual expenses incurred in transporting the merchandise from the factory to the vessel.

*Delmonico International Corp.* v. *United States*, 52 Cust. Ct. at page 659.

Under the authority of *Aceto Chemical Co., Inc.* v. *United States*, 51 CCPA 121, C.A.D. 846 (1964), which is controlling, the alleged "offers" must fall as actual sales take precedence. See also *Luckytex, Ltd.* v. *United States*, 63 Cust. Ct. 659, A.R.D. 257, 302 F. Supp. 1326 (1969); *Haddad & Sons, Inc.* v. *United States*, 56 Cust. Ct. 792, A.R.D. 205 (1966).

This court, therefore, makes the following findings of fact:

1. That the involved merchandise consists of men's cotton dress shirts manufactured and sold by Nippon Iryo Co., Ltd. of Nagoya, Japan, exported on April 12, 1966, and imported by Bud Berman Sportswear, Inc. of New York, N.Y.

2. That the merchandise was appraised on the basis of export value as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, at an f.o.b. port of exportation unit price, which was arrived at by adding to the entered and invoiced unit "ex-factory" prices a pro-rata share of the invoiced handling charges.

3. That sales for export to the United States of such men's cotton dress shirts produced by Nippon were restricted to Bud Berman.

4. That Bud Berman purchased such or similar merchandise on an f.o.b. Nagoya basis, including "handling" charges.

5. That the record does not establish that, on or about the date of exportation, such or similar merchandise was freely sold or offered for sale, as that phrase is defined in section 402(f)(1), in the principal markets of Japan, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States at ex-factory prices, not including "handling" charges.

We, therefore, conclude, as matters of law:

1. That the involved merchandise is properly dutiable on the basis of export value, as defined in section 402(b) of the Tariff Act of 1930, as amended, *supra.*

2. That the appraisements are separable and appellee, a selected purchaser, might rely upon the presumption of correctness attending the ex-factory *prices.*

3. That appellee has failed to establish that the claimed values represent the export value, as that term is defined in section 402(b), *supra.*

4. That the export value of each item is the presumptively correct appraised value.

The decision and judgment below are reversed.

Judgment will be entered accordingly.