(R.D. 11752)

## C. H. Powell Co., Inc. *v.* United States

Entry No. 733051.

(Decided October 26, 1971)

*Allerton deC. Tompkins* for the plaintiff.

*L. Patrick Gray, III*, Assistant Attorney General (*Bernard J. Babb*, trial attorney), for the defendant.

Maletz, Judge: This appeal for reappraisement involves the proper dutiable value of two types of key chains designated as article no. 70 and article no. 80 that were exported in June 1964 from Hong Kong.[1] The key chains were produced by the Sun Wah Ornaments Manufactory of Hong Kong (Sun Wah) and imported for E. A.

---

[1] The article 80 key chain consists of a 25 mm. unpolished key ring that is connected by a small jump ring to an unpolished snake chain 1¼ inches long and 3.2 mm. in diameter. Article 70 is the same as article 80 except that it has an additional jump ring at the other end of the snake chain.

Adams & Son, Inc. of Pawtucket, Rhode Island (Adams). They were entered at their invoice prices, which in the case of the article 70 items was $1.70 per gross, f.o.b. Hong Kong, and in the case of the article 80 items, $1.63 per gross, f.o.b. Hong Kong.

The appraisement by the government was made at $2.00 per gross, net packed, for the article no. 70 key chains and at $1.93 per gross, net packed, for the article no. 80 key chains. The basis of the appraisement was export value as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956. The merchandise does not appear on the Final List, T.D. 54521.

Plaintiff agrees that export value is the proper basis of appraisement but claims that the proper dutiable values on that basis are the invoice prices, i.e., $1.70 per gross, net packed, for the article no. 70 key chains, and $1.63 per gross, net packed, for the article no. 80 key chains. Thus the issue is whether plaintiff has proven that these invoice prices contain all the elements of statutory export value.

Pertinent are sections 402(b) and (f) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956. Section 402(b) reads as follows:

> (b) Export Value.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

Section 402(f) reads as follows:

> (f) Definitions.—For the purposes of this section—
> (1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—
>> (A) to all purchasers at wholesale, or
>> (B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,
> without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.
> (2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exporta-

tion of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

\*     \*     \*     \*     \*     \*     \*

(4) The term "such or similar merchandise" means merchandise in the first of the following categories in respect of which export value, United States value, or constructed value, as the case may be, can be satisfactorily determined:

(A) The merchandise undergoing appraisement and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, the merchandise undergoing appraisement.

(B) Merchandise which is identical in physical characteristics with, and was produced by another person in the same country as, the merchandise undergoing appraisement.

(C) Merchandise (i) produced in the same country and by the same person as the merchandise undergoing appraisement, (ii) like the merchandise undergoing appraisement in component material or materials and in the purposes for which used, and (iii) approximately equal in commercial value to the merchandise undergoing appraisement.

(D) Merchandise which satisfies all the requirements of subdivision (C) except that it was produced by another person.

We turn first to the record starting with the testimony of Joseph W. Ress, the president and general manager of the importer Adams which is in the business of manufacturing and importing findings (component parts) for the jewelry and novelty trade and selling them at wholesale. His testimony was to the following effect: Adams was an independent customer of, and in no way affiliated with, Sun Wah, the manufacturer of the key chains in issue. On May 1, 1964, Sun Wah wrote Adams enclosing a price list in which the article no. 70 key chains in issue were offered at a price of $1.70 per gross and the article no. 80 key chains at a price of $1.63 per gross. On that same day, May 1, 1964, Adams—which had been in telephonic communication with Sun Wah—made out two purchase orders immediately for the key chains in question as the prices specified in the price list, i.e., $1.70 per gross for the article no. 70 key chains and $1.63 for the article no. 80 key chains. Subsequently, the imported merchandise was delivered against these two orders. Again in June 1964 and August 1964, Adams placed further orders with Sun Wah for the article no. 80 key chains at the same price of $1.63 per gross, and these key chains likewise were delivered against these orders. At no time did Sun Wah impose any restrictions upon disposition or use of the key chains by Adams.

The record shows further that on October 30, 1963, some eight months prior to the exportations involved here, Sun Wah and Adams

entered into a written contract under which Sun Wah agreed to supply Adams for a year its full production, up to 30,000 gross per month, of article nos. 47 and 49 key chains and other designated types of key chains. The contract did not, however, cover article no. 70 or article no. 80 key chains. Also included in the contract was a provision requiring Adams to loan Sun Wah the sum of $60,000, secured by a mortgage on Sun Wah's property, which was to be repayable without interest for the first year, with interest to accrue thereafter. The purpose of this loan was to enable Sun Wah to purchase snake chains and brass materials for the key chains covered by the contract.

The article no. 47 key chain covered by this contract of October 1963 consisted of a 25 mm. unpolished key ring, and a 1¼-inch unpolished snake chain with two jump rings. It was essentially the same as the article no. 70 key chain in issue here (see note 1, *supra*), except that the snake chain in the article no. 47 key chain was imported into Hong Kong from Germany, while the snake chain in the article 70 key chain was produced by Sun Wah at its plant in Hong Kong. The article no. 49 and the article no. 80 key chains were comparable in the same manner.

Under the October 30, 1963 contract, the price for the article no. 47 key chains sold by Sun Wah to Adams was $1.95 per gross and for the article no. 49 key chains, $1.88 per gross. This compared with Sun Wah's prices to Adams (as previously indicated) of $1.70 per gross for the article no. 70 key chains and $1.63 per gross for the article no. 80 key chains. To explain these price differences, Ho Sau-lok, joint manager and one of the two owners of Sun Wah, provided an affirmation stating in part that:

> * * * These Articles #80 and #70 could be produced and sold by my company at much lower prices than #49 and #47 (which are the articles that contain imported German snake-chain) * * * because the cost of the brass material in Hong Kong was lower than the brass used in the German snake-chain and our production costs for our own snake-chain was lower than that of the imported snake-chain and also because on May 1, 1964 we had 40 of our own snake-chain machines * * *.

The record shows also that in 1964 Sun Wah sold article no. 49 key chains to *companies other than Adams* at a price of $1.93 per gross, which compared with a price of $1.63 per gross for the article no. 80 key chains Sun Wah sold to Adams. This article no. 49 key chain consisted of a 25 mm. key ring connected by a small jump ring to a snake chain 3.2 mm. in diameter. It differed from the article no. 80 key chain in the following respects: (1) the snake chain for the no. 49 was made in Germany and was more expensive; (2) the snake chain for the

no. 49 was 1⅜ inches to 1½ inches long as compared to the no. 80 snake chain that was 1¼ inches long; and (3) the no. 49 had a key ring and snake chain that were polished, while the no. 80 key ring and snake chain were unpolished.[2]

The affirmation of Ho Sau-lok contains the following comment concerning the significance of these differences from a cost standpoint:

> 5. The foregoing differences are important because the snake chain constitutes a most important cost factor of these articles, and the cost of the snake chain to us is one of the primary factors in the determination of our sales price of the completed key rings and snake chain combination. (1) The imported snake chains costs [sic] us more than the snake chains produced on our own machines. (2) Polishing is a barrel tubbing or rotation action. It gives the item an appearance of a more polished surface. It is an added cost factor not required by E. A. Adams & Son, Inc. (3) A length of 1⅜″ as compared to a length of 1¼″ is an important cost price factor on a large order.

Further on this aspect, Mr. Ress testified that the shorter size of the snake chain in the article no. 70 and article no. 80 key chains as compared to the snake chain in the article no. 47 and article no. 49 key chains sold to companies other than Adams represented from 8 to 15 cents a gross less in cost. He also testified that the difference in the cost of polishing and not polishing was about 5 cents per gross. Finally he stated that the third element contributing to the price differential was the fact that the snake chain on the article nos. 70 and 80 key chains was made in Hong Kong while the snake chain on the foregoing article nos. 47 and 49 key chains was imported from Germany.

Turning now to the legal considerations, it will be recalled that the government appraiser found that the proper export value for the article no. 70 key chains was $2.00 per gross and for the article no. 80 key chains, $1.93 per gross. Challenging this appraisement, plaintiff (as we have seen) contends that the proper export value for the articles is represented by their invoice prices, i.e., $1.70 and $1.63 per gross, respectively.

Export value (as we have seen) is defined by section 402(b) of the Tariff Act of 1930, as amended, as the price at which such or similar merchandise, at the time of exportation, was freely sold or, in the absence of sales, offered for sale for exportation to the United States. It is in this setting that plaintiff's proof has been directed

---

[2] The record shows that in 1964 Sun Wah also sold article no. 47 key chains to companies other than Adams at a price of $2.00 per gross, which compared with a price of $1.70 per gross for the article no. 70 key chains Sun Wah sold to Adams. It is further to be noted that the article no. 47 and the article no. 49 key chains Sun Wah sold to companies other than Adams differed in most of the respects above enumerated from the article no. 47 and the article no. 49 key chains Sun Wah sold to Adams.

to showing that the prices at which Adams purchased the articles in issue from Sun Wah meet the statutory requirements of export value.

Under section 402(f)(4) of the Tariff Act of 1930, as amended, in considering "such" or "similar" merchandise, merchandise identical to the merchandise under consideration and made by the same person in the same country is to be given first priority. See e.g., *United States v. F. W. Myers & Co., Inc.*, 63 Cust. Ct. 706, 712, A.R.D. 264, 306 F. Supp. 1396, 1401 (1969). Thus, since it is plaintiff's contention that an export value exists, based upon the sales by Sun Wah of identical merchandise, i.e., article no. 70 and article no. 80 key chains, it was plaintiff's burden to show that the circumstances of the sales of that merchandise meet all the statutory requirements. One of these requirements is that at the time of the present exportation such merchandise was "freely sold" within the meaning of that term as set forth in section 402(f)(1). That section provides that the term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered for sale (A) to all purchasers at wholesale, or (B) in the ordinary course of trade to selected purchasers at a price which fairly reflects the market value of the imported merchandise. In short, plaintiff, in claiming an export value different from the appraised values, was required to prove either that such merchandise was freely sold to all purchasers at wholesale or that such merchandise was freely sold to a selected purchaser in the ordinary course of trade at prices which fairly reflect the market values of the imported merchandise.

Based on the entire record, it must be concluded that the article nos. 70 and 80 key chains were not, during the pertinent period, sold or freely offered for sale by Sun Wah to all purchasers at wholesale but, rather, were offered by Sun Wah to Adams as a selected purchaser within the meaning of section 402(f)(1)(B).[3] For one thing, it will be remembered that the purchase by Adams of the article 70 and 80 key chains began with a written offer that was made to it by Sun Wah on May 1, 1964. Yet there is no probative evidence whatever in the record to show that during that period these key chains were sold or offered for sale by Sun Wah to anyone other than Adams (which coincidentally had a mortgage on Sun Wah's property by virtue of the $60,000 loan it had made to Sun Wah the previous October). Also relevant on this aspect is the following portion of an affirmation by Ho Sau-lok, the co-owner of Sun Wah:

> * * * Since the end of April 1964, when we first started in a substantial way to make our own snake-chain, we added more

[3] A selected purchaser situation within the meaning of this section results when the seller restricts his sales to one or more specifically designated purchasers. E.g., *Aceto Chemical Co., Inc.* v. *United States,* 51 CCPA 121, 127, C.A.D. 846 (1964).

snake-chain machines made in our own machine shop. This extra capacity, if used and sold, significantly lowered the cost per unit overhead of the snake-chain produced. We were, therefore, desirous of selling our entire production of Articles #80 and #70 which Adams agreed to take at the reduced prices. Our total production of Articles #80 and #70 was sold only to Adams in this period from May 1, 1964 through November 1964 and for some time afterwards. This was done without any exclusivity arrangements between us but on a strictly buyer-seller relationship. * * *

Since Adams agreed to take our full production of Articles #80 and #70 (but not the full production of the other key chain and key rings made by us) and Adams was an established good customer, we sold them this production, which was favorable to us, as we would to any other wholesale buyers who would have been willing and ready to buy on the same terms and conditions and at the same prices. If Adams did not agree to take the entire production of Articles #70, we would have actively sought other good wholesale buyers on the same terms and conditions and for the same prices.

In a later affirmation, Ho reiterated the foregoing portion of his previous affirmation and stated the following:

This is a correct statement of the transaction except that the reference in the last sentence quoted above should have been to Article #80 also. It was not "exclusive" other than that the full production was taken by E. A. Adams & Son, Inc. of Nos. 70 and 80 made on our own snake-chain machines as previously explained, which at all times was only a part of our entire capability to produce other key chains for which we were at all times open to orders from our customers.

To similar effect, in an affidavit accompanying a customs agent's report,[4] Mr. Ho stated that "[t]he chains which were exclusive to E. A. Adams & Son Inc. were No. 80 and No. 70, and were the same as No. 49 and No. 47 except that the latter had German snake chains and the former our own."

As previously pointed out, there is no probative evidence whatever in the record to show that article nos. 70 and 80 key chains were in fact freely offered to anyone other than Adams. And this is emphasized by the first affirmation of Ho Sau-lok which makes plain that Sun Wah's entire production of the article 70 and 80 key chains was offered

---

[4] The court in an order dated January 16, 1969, overruled plaintiff's objection to this customs agent's report in being admitted in evidence, subject to plaintiff's right to offer rebuttal evidence. Plaintiff subsequently moved that this order be vacated, which motion was denied by the court in a memorandum opinion. *C. H. Powell Co., Inc.* v. *United States,* 62 Cust. Ct. 843, R.D. 11638, 297 F. Supp. 879 (1969). Plaintiff has again renewed its objection to the admission of the custom agent's report. However, the court sees no reason for departing from its previous rulings on this question. Plaintiff, in addition, has interposed objection to certain specific conclusions made by the customs agent in his report. The court believes this objection has merit and accordingly has given no weight to such conclusions.

in the first instance not to all prospective purchasers but only to Adams. As Mr. Ho explained, it was only if Adams did not agree to take the entire production that Sun Wah would have sought out other purchasers for that production. It is true, of course, that "the purchase of the entire available quantity by one buyer does not make him a selected purchaser if the merchandise was freely offered on the same terms to all who cared to buy." *Judson Sheldon International Corp., et al.* v. *United States*, 67 Cust. Ct. 577, 580, 581, A.R.D. 295 (1971); *United States* v. *Thomas P. Gonzales Corp.*, 66 Cust. Ct. 597, A.R.D. 283 (1971); *National Carloading Corp.* v. *United States*, 43 Cust. Ct. 531, R.D. 9535 (1959), aff'd, *United States* v. *National Carloading Corp.*, 46 Cust. Ct. 745, A.R.D. 125 (1961). Thus here, the fact that Adams purchased Sun Wah's entire production of article nos. 70 and 80 key chains would not in and of itself serve to constitute Adams a selected purchaser. However, as we have seen, the record fails to show that the article 70 and 80 key chains were freely offered for sale to all purchasers. Furthermore, it would seem from the affirmations to Ho Saulok and the course of dealings of the parties over a period of several years that the arrangement between Sun Wah and Adams in effect obligated Sun Wah to sell the article nos. 70 and 80 key chains over a period of time only to Adams. Accordingly, Adams was a selected purchaser within the meaning of section 402 (f) (1) (B).

Plaintiff further contends that in the event the court concludes—as it does—that Adams was a selected purchaser, Sun Wah's invoice prices to Adams for the article nos. 70 and 80 key chains reflect their market value and therefore represent export value. In point on this phase is *Service Afloat, Inc., Howard Hartry, Inc.* v. *United States*, 66 Cust. Ct. 519, R.D. 11734, 322 F. Supp. 1396 (1971), in which the court held that in determining whether an invoice price to a selected purchaser fairly reflects the market value, it is necessary to compare that price with the selling price in the home market and in third countries in order to prevent the possible "rigging" of export value through sales at nonmarket prices. The court concluded further that if merchandise exported to the United States is not sold in the home market and in third countries, the price to the United States may still fairly reflect the market value where the evidence shows that the price resulted from bona fide negotiations and is high enough to include all the costs of production and a profit.

In the present case, the evidence shows that the entire production of article nos. 70 and 80 key chains was sold by Sun Wah to the importer Adams from which it can reasonably be inferred that these articles were not sold in the home market, Hong Kong, or in third countries. In the absence of such sales, plaintiff still could have proven that the invoice prices fairly reflected market value by showing that

they resulted from bona fide negotiations and were high enough to include all costs of production and a profit. However, plaintiff has not even attempted such a showing. Indeed, all that the evidence shows is that the key chains were sold and purchased by the importer at $1.63 and $1.70 per gross. There is no further evidence on the question. Hence on this score plaintiff has failed to show that its claimed values are equal to prices which fairly reflect the market value of the imported merchandise.

It is also to be noted that in determining whether a price fairly reflects market value, all sales of such or similar merchandise are relevant. *United States* v. *Acme Steel Company*, 51 CCPA 81, C.A.D. 841 (1964). Bearing this in mind, as previously noted, during the time of the present exportations, the manufacturer, Sun Wah, sold Adams not only article nos. 70 and 80 key chains but also article nos. 47 and 49 key chains (under the contract of October 30, 1963). The record further shows that these article no. 47 key chains were essentially the same as the article no. 70 key chains in issue except that the snake chain in the article 47 key chains was imported into Hong Kong from Germany while the snake chain in the article 70 key chains was produced in Hong Kong by Sun Wah. And the article no. 49 and article no. 80 key chains were comparable in the same manner. However, notwithstanding these similarities, Sun Wah's price to Adams for the article no. 47 key chains was $1.95 per gross as compared to its price to Adams of $1.70 per gross for the essentially same article no. 70 key chains. Also, Sun Wah's price to Adams for the article no. 49 key chains was $1.88 per gross as compared to its price of $1.63 per gross for the essentially same article no. 80 key chains. According to Ho Sau-lok, these differences in prices were occasioned by three elements: (1) the cost of the brass material in Hong Kong was lower than the brass used in the German snake chain; (2) Sun Wah's production costs for its own snake chain was lower than that of the imported German snake chain; and (3) Sun Wah had 40 of its own snake chain machines. However, it is not enough for a witness to state that the difference in price was due to these elements; a party must show the difference by specific evidentiary facts from which the court can draw the conclusion. Put otherwise, since "there is no evidence by the plaintiff of the specific amounts of costs incurred by the exporter for the factors which plaintiff states account for the differential * * *, plaintiff has failed to prove an export value for the imported merchandise." *C. J. Tower & Sons of Buffalo, Inc.* v. *United States*, 58 Cust. Ct. 834, 841, A.R.D. 223 (1967). See also e.g., *Union Carbide Corporation* v. *United States*, 58 Cust. Ct. 821, A.R.D. 222 (1967).

Lastly, the record shows (as previously set out) that in 1964 Sun Wah sold article no. 49 key chains to companies other than Adams

at a price of $1.93 per gross which compared with a price of $1.63 per gross for the article no. 80 key chains Sun Wah sold to Adams. Also in 1964, Sun Wah sold article no. 47 key chains to companies other than Adams at a price of $2.00 per gross as contrasted to the price of $1.70 per gross for the article no. 70 key chains Sun Wah sold to Adams. On this point, plaintiff argues that the article nos. 47 and 49 key chains sold by Sun Wah to others than Adams are *not* "similar merchandise" within the meaning of section 402(f)(4)(C) to the article nos. 70 and 80 key chains, and hence are not relevant in determining whether the invoice prices fairly reflect market value. That section refers to merchandise which, when compared to the merchandise undergoing appraisement, is (1) produced in the same country by the same person; (2) like the merchandise under consideration in component material and purposes; and (3) approximately equal in commercial value. According to plaintiff, the article 47 and 49 key chains sold to others than Adams are not similar on the asserted basis that they are produced from more costly constituents and therefore have a substantially greater commercial value. Defendant contends that the provision does not require that the articles being compared for similarity must be identical in commercial value but only approximately equal. On this basis, defendant argues that the differences are not sufficiently great to render the key chains sold by Sun Wah to others than Adams dissimilar to those in issue here.

In the last analysis, it is unnecessary to resolve this controversy. For assuming that plaintiff is correct that the article 47 and 49 key chains sold by Sun Wah to others than Adams are not similar to the key chains in issue and are therefore irrelevant, it must be concluded on the basis of the record previously discussed that plaintiff has failed to show that its claimed values fairly reflect the market value of the articles in issue.

Assuming on the other hand that the foregoing article 47 and 49 key chains are "similar" to those in issue, plaintiff presented testimony designed to show that the difference in prices—which amounted to 30 cents per gross as between the article no. 47 and article no. 70 key chains and as between the article 49 and article no. 80 key chains—was due to polishing, longer snake chain and a greater expense for the German snake chain used in producing the article nos. 47 and 49 items. In this connection, the witness Ress testified (as noted before) that the difference in the cost of polishing and not polishing was about 5 cents per gross, while the longer snake chain in the article 47 and 49 items represented an additional cost of 8 to 15 cents a gross. Accepting this testimony at face value, the foregoing factors would account for a price differential of from 13 to 20 cents a gross—whereas the actual price differential was 30 cents a gross. This would leave a

difference—which is scarcely insubstantial—of from 10 to 17 cents a gross that is unaccounted for save by general testimony that the imported German snake chain was more expensive than that produced by Sun Wah in Hong Kong. But as previously observed, it is not enough for a party to have a witness testify that a price differential was due to a given element; it is incumbent upon the party to provide evidence of the specific amount of costs incurred which account for that differential. E.g., *C. J. Tower & Sons of Buffalo, Inc.* v. *United States, supra,* 58 Cust. Ct. at 841.

In summary, it is concluded that plaintiff has failed to prove (i) that merchandise such as that involved here was freely sold to all purchasers at wholesale; or (ii) that its claimed prices fairly reflected the market value of the imported merchandise. The appraised values are, therefore, affirmed and the appeal for reappraisement is dismissed. Judgment will be entered accordingly.