**ERNEST LOWENSTEIN, INC.**

v.

**UNITED STATES.**

**R.D. 11776; Court No. R64/2246.**

United States Customs Court.
Nov. 16, 1973.

Siegel, Mandell & Davidson, New York City (Harvey A. Isaacs and Steven S. Weiser, New York City, of counsel), for plaintiff.

Irving Jaffe, Acting Asst. Atty. Gen. (Glenn E. Harris, trial atty., New York City), for defendant.

MALETZ, Judge:

The issue in this appeal for reappraisement is the correct dutiable value of certain glass stones, pendants, beads and similar merchandise (hereinafter referred to as "stones and beads") that were exported from Austria, the country of manufacture, in March 1963 and entered at the port of New York in April 1963. The merchandise was appraised on the basis of export value as defined in section 402(b) of the Tariff Act of 1930, as amended, at the entered invoiced unit values *plus* 14.3 percent.

Plaintiff agrees that export value is the proper basis for appraisement but contends that such value is the appraised value *less* 15 percent.

The merchandise, which was used to make costume jewelry, was manufactured in Wattens, Austria by D. Swarovski & Co. (Swarovski), the sole manufacturer in that country of such or similar articles. During the period in issue, Swarovski had a distributorship agreement with Lowenstein Overseas Corporation, known since 1962 as Lowenstein Overseas Company (LOC), a Liechtenstein concern to which Swarovski was totally unrelated. LOC was appointed sole distributor for Swarovski stones and beads in all countries throughout the world, except Europe, under a contract which provided, in part, as follows:

> D. Swarovski appoints LOC as its sole distributor of Swarovski jewelry glass stones for all countries, with the exception of Europe, and subject to the following reservation. D. Swarovski reserves the right to make direct export sales insofar as direct shipments may be required by existing contractual obligations or by the laws of Austria or of the foreign country in question or by commercial or other international agreements or measures. Subject to the above-mentioned reservation, D. Swarovski agrees not to sell any jewelry glass stones to these territories.

LOC purchased the articles, for exportation to the United States, at the Swarovski world list price, less a discount of 15 percent [1]—which amount is claimed to be the correct dutiable export value of the merchandise. LOC's exclusive customer for these articles in the United States was the plaintiff-importer Lowenstein which paid LOC the Swarovski list price, less 12½ perment. No restriction was placed on the articles' disposition or use by plaintiff except that resale was limited to the United States and certain other countries within the terms of LOC's distributorship agreement.

During the period under consideration, when LOC received an order from the plaintiff, LOC would place an identical order with Swarovski and instruct the latter to ship the merchandise directly from Wattens, Austria to plaintiff in the United States.[2] Upon receiving Swarovski's invoice, which was calculated at the latter's published list price, less 15 percent, LOC, in turn, would bill plaintiff at the list price, less 12½ percent.

Thus, the unit prices shown on the LOC invoices herein are the Swarovski list prices, less 12½ percent. However, since the merchandise was appraised on the basis of Swarovski's list prices, without discount (as indicated by the appraising officer's notations on the invoices), the appraiser added 14.3 percent to the invoiced prices to reach such list prices.

Swarovski, in addition to selling stones and beads for export to the United States, also sold identical articles in the home market to Austrian jewelry manufacturers and other Austrian purchasers at list price with no discount.[3] Most of the sales to its Austrian customers were made through its branch office in Linz, Austria. Through its office in Wattens, Austria, Swarovski also sold stones and beads (identical to those purchased by LOC) for export to various countries in Europe at list and below list prices, as follows: Sales by Swarovski to manufacturers in Belgium, Denmark, Finland, Norway, Poland and Sweden were at list prices; sales to dealers in France and Greece were at list, less 19 and 12½ percent, respectively; sales to one dealer in West Germany were at a

---

1. This amount did not vary with the quantities purchased.

2. The merchandise in this case, through re-invoicing and direct shipment by Swarovski to plaintiff in the United States, never physically entered the commerce of Liechtenstein, and it is therefore undisputed that the country of exportation was Austria and not Liechtenstein.

3. Although most of this merchandise apparently was used for home consumption, the evidence indicates that a small, undisclosed amount found its way to two dealers in the United States.

15 percent discount from list; and sales to dealers in Belgium, Eire,[4] Great Britain, Holland, Portugal, Spain, Switzerland, its branch office in West Germany and its "representative" in Italy [5] were at a 10 percent discount.

In 1962, LOC accounted for approximately 51 percent and in 1963 for approximately 55 percent of Swarovski's total sales of stones and beads. During this period, about 75 percent of LOC's purchases were resold and shipped directly by Swarovski to plaintiff in the United States with the balance going to other non-European destinations. The approximate breakdown, in monetary terms, of Swarovski's shipments of stones and beads sold during this period was as follows: 40 percent was shipped to the United States; 15 percent to other LOC customers (non-European); 15 percent to Austrian manufacturers and other purchasers; and 30 percent to other countries in Europe.

■ The parties agree that the merchandise is not specified on the Final List, and that there is no issue as to usual wholesale quantities or principal markets within the meaning of the valuation statute; also, it is not disputed that plaintiff-importer is a selected purchaser at wholesale within the meaning of section 402(f)(1)(B) of the Tariff Act of 1930, as amended.[6] Further, it is undisputed that the imported merchandise, which was reinvoiced and shipped directly by Swarovski to plaintiff without entering the commerce of any other country, was sold for export to the United States from Austria.[7]

The sole issue, as the parties agree, is whether the prices paid by LOC to Swarovski—i. e., list, less 15 percent—fairly reflect the market value of the merchandise within the meaning of section 402(f)(1), as amended, and, hence, represent statutory export value.[8]

The pertinent statutory provisions of section 402 of the Tariff Act of 1930, as amended, as follows:

(b) *Export Value.*—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual

---

4. No sales were made to Eire after 1962.

5. A few items were sold to Italy at a 20 percent discount.

6. A selected purchaser situation within the meaning of section 402(f)(1)(B) results when a seller restricts his sales to one or more specifically designated purchasers. See e. g., Aceto Chemical Co., Inc. v. United States, 51 CCPA 121, 127, C.A.D. 846 (1964); C. H. Powell Co., Inc. v. United States, 67 Cust.Ct. 493, 498, n. 3, R.D. 11752 (1971), aff'd, 69 Cust.Ct. 257, A.R.D. 307 (1972).

7. Although the sale at issue was between parties located in Austria (Swarovski) and Liechtenstein (LOC), the merchandise was exported directly from Austria to the United States, the merchandise never entering the commerce of any other country. It is well established that in such a situation, the sale from the exporting country is the sale to be considered in reappraisement proceedings. United States v. G. W. Sheldon & Co., 53 Treas.Dec. 34, T.D. 42541 (1928); United States v. F. W. Hagemann, 39 CCPA 182,

C.A.D. 484 (1952); R. J. Saunders & Co., Inc. v. United States, 42 CCPA 55, C.A.D. 570 (1954); T. M. Duche & Sons, Inc. v. United States, 49 Cust.Ct. 377, R.D. 10325 (1962), aff'd, 52 Cust.Ct. 624, A.R.D. 170 (1964).

8. At the first pretrial conference in this case, counsel for the defendant made nine separate contentions, including a contention (No. 5) that the prices invoiced by Swarovski to LOC did not fairly reflect the market value of the merchandise. To support each of these nine contentions, defendant's counsel supoenaed from unrelated parties and introduced a large number of documents, resulting in an extremely voluminous record. In his brief, however, counsel for defendant abandoned all but his fifth contention, thus conceding, in effect, that a major part of the record—which concerned the other eight contentions—was irrelevant. To obviate such a situation in the future, and thus avoid wasting the time of the court, opposing counsel and unrelated parties, it is essential that counsel prepare their cases thoroughly *before* and not *after* trial.

wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

\* \* \* \* \* \*

(f) *Definitions.*—For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

■ With respect to the proof necessary to establish that a price to a selected purchaser fairly reflects market value, the court's primary emphasis has been to determine whether a showing has been made which would negate the possibility of collusion between the selected purchaser and seller in rigging the price of goods. See e. g., Myerson Tooth Corporation v. United States, 61 Cust.Ct. 540, 544, R.D. 11597 (1968), aff'd, 64 Cust.Ct. 860, A.R.D. 273, 313 F.Supp. 1016 (1970); Service Afloat, Inc. v. United States, 66 Cust.Ct. 519, 522, R.D. 11734, 322 F.Supp. 1396, 1398 (1971).

Accordingly, one method has been to compare the export price to the selected purchaser in the United States with the price at which the merchandise was sold in the home market or to third countries, other than the United States—this on the basis that all sales in the ordinary course of trade are relevant in determining whether the price in question fairly reflects market value. See e. g., United States v. Acme Steel Company, 51 CCPA 81, C.A.D. 841 (1964); John V. Carr & Son, Inc. v. United States, 52 CCPA 62, C.A.D. 860 (1965); Myerson Tooth Corporation v. United States, *supra,* 64 Cust.Ct. 860, 313 F.Supp. 1016.

An alternative method has been to establish that the transaction was the result of *bona fide* negotiations between the parties and was high enough to include all costs of production, general expenses entering into the export transaction, and a profit. John V. Carr & Son, Inc. v. United States, *supra,* 52 CCPA at 68; United States v. F. W. Myers & Co., Inc., 63 Cust.Ct. 706, A.R.D. 264, 306 F. Supp. 1396 (1969); C. H. Powell Co., Inc. v. United States, *supra,* 69 Cust.Ct. at 261; Exbrook, Inc. v. United States, 69 Cust.Ct. 224, R.D. 11772 (1972).

■ Where the first method of establishing the claimed value is utilized, and sales in the home market or to third countries are at higher prices than sales for export to the United States, it is incumbent upon the claimant to explain the disparity between them. E. g., United States v. Acme Steel Company, *supra,* 51 CCPA at 89; John V. Carr & Son, Inc. v. United States, *supra,* 52 CCPA at 68. "The clear trend of the decisions is to look for proofs breaking down the specific cost items making up the difference" between the home market and third country prices on one hand and the export prices to the United States on the other. C. J. Tower & Sons of Niagara, Inc. v. United States, 60 Cust.Ct. 938, 941–942, A.R.D. 233 (1968), and cases cited. See also e. g., Myerson Tooth Corporation v. United States, *supra,* 64 Cust.Ct. 860, 313 F.Supp. 1016. It is to be added that the costs or expenses involved need not jibe to the penny; it is sufficient if they reasonably

approximate the difference in the sales prices. United States v. Lockwood & Freidin, 61 Cust.Ct. 573, 579, A.R.D. 241, 287 F.Supp. 283, 288 (1968).

Against this background, plaintiff, employing the first method, seeks to discredit the appraised values and establish the correctness of its claimed values by showing through two affidavits of Daniel Swarovski, one of the owners of Swarovski, that certain expenses were incurred by Swarovski by reason of sales from its branch office at Linz, Austria to manufacturers in Austria for home consumption, which expenses were *not* incurred in connection with sales of merchandise from Swarovski's plant in Wattens, Austria for export to the United States. Expressed in terms of percentage of list price, plaintiff claims that the following costs, as shown in Daniel Swarovski's affidavits, were attributable only to sales in the home market:

| | | |
|---|---|---|
| (a) | Shipping salaries | 1.87% |
| (b) | Taxes | 5.64% |
| (c) | Rent | 0.31% |
| (d) | Supplies | 0.17% |
| (e) | Utilities | 0.13% |
| (f) | Travelling | 0.10% |
| (g) | Advertising | 1.29% |
| (h) | Miscellaneous | 1.43% |
| | | 10.94% |

As a further explanation of the price differential, the affiant Daniel Swarovski stated that during the period in issue, Swarovski was paid a "reimbursement" by the Austrian government of "5.78% of the invoice value" on exports of glass stones and beads from Austria.

Plaintiff contends that, on the basis of the foregoing figures—i. e., the total expenses incurred in Linz (home market sales) which were not incurred in Wattens (export sales), coupled with the Austrian government's reimbursement on exports—it has "more than adequately explained the difference between the home consumption price (list) and the price for export to the United States (list less 15%)."

■■ We do not agree. For even assuming *arguendo* that the court may ignore sales to third countries and restrict its scrutiny to the home market prices, plaintiff has nonetheless failed to satisfactorily explain the more than 15 percent price differential between the sales in .Linz for home consumption and those in Wattens for export to the United States. Specifically, we cannot understand (particularly in light of the frequently vague responses given on the Swarovski deposition to the questions concerning those items) how the shipping salaries, taxes, rent, supplies and utilities paid for in Linz—which add up to 8.12 percent—constitute other than the fixed expenses generally incurred in producing an article, be it for home consumption or for export. See e. g., John V. Carr & Son, Inc. v. United States, *supra*, 52 CCPA 62. They are, it would seem, the usual and ordinary expenses involved in the manufacture of merchandise, either in Linz or in Wattens. And nothing in the record demonstrates otherwise. Accordingly, absent explanation, these "costs" do not satisfactorily explain, even in part, the disparity in prices. Nor, of course, are so-called undisclosed "miscellaneous" expenses allowable in this regard.

However, it is to be noted that unlike the foregoing costs, the travelling expenses would seem to have been incurred solely by the employees of the Linz branch office in making sales to Austrian purchasers, and that the advertising expenditures were solely for advertising in Austria. These two costs, therefore, constitute selling expenses incurred solely in connection with producing goods for home consumption and are unrelated to sales for export to the United States. See e. g., John V. Carr & Son, Inc. v. United States, *supra*, 52 CCPA 62. Accordingly, they may be considered as reflecting, in part, the higher prices paid by purchasers in the home market.

Similarly, reimbursement by the Austrian government to Swarovski of a percentage of the invoice price of all glass beads and stones exported from

that country might also be considered as accounting, in part, for the United States export and the home market price differential. However, it is not clear whether the 5.78 percent figure cited by plaintiff is a fixed flat rate applicable to all export sales or simply a composite figure based on an averaging out of varying discounts. Without additional evidence on this point, the 5.78 percent figure cannot be relied upon.

■■■ These considerations aside, there are also fatal deficiencies in plaintiff's proof in connection with the record of sales for export to *third countries*. Although plaintiff glosses lightly over these transactions, the court may not ignore the fact that, while sales to a majority of the named countries were at a minimum of list, less 10 percent, the sales to manufacturers in six countries were at list price with no discount. And sales to manufacturers are sales to industrial users and hence to wholesalers under the definition of "purchasers at wholesale" appearing in section 402(f)(3) of the Tariff Act of 1930, as amended.[9] The American Greiner Electronic, Inc. v. United States, 62 Cust.Ct. 905, 913, R.D. 11658, 298 F.Supp. 313, 319 (1969), aff'd, 66 Cust.Ct. 644, A.R. D. 289, 328 F.Supp. 498 (1971) (appeal dismissed). See also Aceto Chemical Co., Inc. v. United States, 51 CCPA 121, C.A.D. 846 (1964).

Therefore, sales to this class of purchasers are also relevant, under the guidelines established by the *Acme Steel* and *John V. Carr* cases, in determining whether the prices paid by the selected purchaser herein comport with statutory export value.

It is also significant that plaintiff has failed to give any breakdown, by percentages or otherwise, of the number of sales to each country, or of the quantities involved in such sales. Thus, there is no basis for inferring that the export trade in Swarovski stones and beads to any of these countries was unsubstantial. Nor is it claimed that sales to any country should be disregarded as negligible, de minimis or not in the usual wholesale quantities. See, e. g., The American Greiner Electronic, Inc. v. United States, *supra*,' 62 Cust.Ct. 905, 298 F.Supp. 313. Furthermore, we are not aware of special or extraordinary circumstances attendant upon any of the sales which would indicate that they were not made in the ordinary course of trade. Accordingly, the sales at list price to other countries may not be disregarded in ascertaining whether the claimed prices are fairly reflective of market value.

In sum, plaintiff's inability to reconcile the sales at 15 percent off list to LOC, its selected purchaser, with its sales at list for home consumption in Austria and for export to other countries in Europe has raised an insuperable barrier to establishing its claim that the prices to LOC fairly reflect the market value of the goods. The appraised values are therefore affirmed and the appeal for reappraisal dismissed. Judgment will be entered accordingly.

9. Section 402(f)(3) provides:
The term "purchasers at wholesale" means purchasers who buy in the usual wholesale quantities for industrial use or for resale otherwise than at retail; or, if there are no such purchasers, then all other purchasers for resale who buy in the usual wholesale quantities; or, if there are no purchasers in either of the foregoing categories, then all other purchasers who buy in the usual wholesale quantities.